AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Missouri

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH anthony.tabron@hotmail.com buck2nasty@icloud.com dombrady102305@gmail.com and THAT IS STORED AT PREMISES CONTROLLED BY APPLE INC.

**FILED UNDER SEAL**

4:26 MJ 2011 JSD

SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS

## APPLICATION FOR A SEARCH WARRANT

I, Joseph Labitska, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

SEE ATTACHMENT A

located in the ______ District of Florida, there is now concealed

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

XX evidence of a crime;
XX contraband, fruits of crime, or other items illegally possessed;
XX property designed for use, intended for use, or used in committing a crime;
a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

18 U.S.C. §§ 286, 287, and 371 in addition to 26 U.S.C. § 7206(2)

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

✓ Continued on the attached sheet.
❑ Delayed notice of _____ days (give exact ending date if more than 30 days: ______.) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the following is true and correct

Joseph Labitska
*Applicant's signature*
Joseph Labitska, SA, IRS
*Printed name and title*

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: February 3, 2026

*Judge's signature*

City and State: St. Louis, Missouri

Honorable Joseph S. Dueker, U.S. Magistrate Judge
*Printed name and title*

AUSA: GWENDOLYN CARROLL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH anthony.tabron@hotmail.com buck2nasty@icloud.com dombrady102305@gmail.com and THAT IS STORED AT PREMISES CONTROLLED BY APPLE INC. | No. 4:26 MJ 2011 JSD<br><br>**FILED UNDER SEAL**<br><br>SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Joseph Labitska, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent with Internal Revenue Service – Criminal Investigation (IRS-CI), and I have served in this capacity since 2023. My duties as a Special Agent include

investigating criminal violations of the Internal Revenue Code and related offenses. I hold a Bachelor of Arts Degree in Accounting and Business Administration from Westminster College (Fulton, MO) and a Master's Degree in Fraud and Forensic Examination from West Virginia University. I have received training in law enforcement and investigative techniques, including tax law and accounting principles, at the Federal Law Enforcement Training Center in Glynco, GA. As a result of my training and experience as a Special Agent, I am familiar with federal laws. I have been trained to recognize the methods and trends of tax offenses, fraud, and the laundering of the proceeds of fraud schemes and other financial crimes.

3. I make this affidavit in support of an application for a warrant for information associated with the Apple iCloud accounts identified as belonging to Anthony TABRON, linked to account identifier anthony.tabron@hotmail.com (SUBJECT ACCOUNT 1) and Jerelle GATLIN, linked to identifier buck2nasty@icloud.com (SUBJECT ACCOUNT 2) and Dominique YOUNG, linked to identifier dombrady102305@gmail.com (SUBJECT ACCOUNT 3). The SUBJECT ACCOUNTS will be referred to as such, and that are stored at a premises controlled by Apple Inc. (the PROVIDER), a provider of electronic communication and remote computing services, headquartered at One Apple Park Way, Cupertino, California 95014.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 286, 287, and 371 in addition to 26 U.S.C. § 7206(2) have been committed by Anthony Tabron, Jerelle Gatlin, and Dominique Young. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court, Eastern District of Missouri is "a district court of the United States . . . that has jurisdiction over the offense being investigated."

## SUMMARY OF PROBABLE CAUSE

6. Federal law enforcement agencies, including Internal Revenue Service – Criminal Investigation (IRS-CI), are investigating the preparation and filing of false income tax returns and false claims against the government committed by Anthony TABRON, Jerelle GATLIN, Dominique YOUNG, and others known or unknown to commit these offenses in the St. Louis Metropolitan area and throughout the United States. As detailed below, activities have been linked to TABRON, GATLIN, and YOUNG who are believed to be the individuals who control the SUBJECT ACCOUNTS. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the Subject Offenses have been committed by TABRON, GATLIN, YOUNG, and others known and unknown. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## STATEMENT OF PROBABLE CAUSE

7. Beginning in or around February 2024, IRS-CI St. Louis Field Office special agents initiated an investigation into the preparation of false income tax returns and false claims against the government. Through information gathered from a proffer session and other investigative steps, as further described below, it was determined Anthony TABRON was orchestrating a scheme to defraud the IRS and to enrich himself and others. TABRON recruited at least three

individuals who live in the St. Louis, MO area including Jerelle GATLIN and Dominique YOUNG, to assist in the scheme. TABRON instructed the coconspirators to advertise income tax preparation services that would guarantee a refund. Once clients were obtained in the St. Louis area, the coconspirators would send the clients' personal identifying information to TABRON (who resides in or near Atlanta, GA) so he could prepare a false income tax return.

8. TABRON added fictitious Forms 1099 with large income tax withholdings to fraudulently obtain and/or inflate a tax refund for which the taxpayer was not lawfully entitled. In addition to the fictitious Forms 1099, residential energy credits the taxpayer did not qualify for were also applied. After TABRON finished the income tax return, he would file it electronically with the IRS and send a copy of the return to the originating coconspirator so they could give it to the client.

9. TABRON filed the returns in connection with Where it Counts Tax Preparation, a business owned and operated by TABRON. The returns directed the IRS to issue refunds into a bank account at GreenDot Bank held by Speedy Refunds LLC, another business that TABRON was associated with, and TABRON used this GreenDot Bank account to pay the "refunds" to the taxpayers.[1] However, TABRON kept a portion of the fraudulent refunds and split the proceeds with his recruiters, issuing payments either through the GreenDot Bank account or through a personal bank account held at JPMorgan Chase. TABRON.

10. To date, IRS-CI has identified, through IP addresses, Preparer Tax Identification Number (PTIN),[2] and/or other attributes, approximately 507 income tax returns filed by TABRON

---

[1] In at least one instance, TABRON and the originating coconspirator split the entire refund, and the taxpayer client did not receive any money associated with the refund.

[2] Anyone who prepares or assists in preparing federal tax returns for compensation must have a valid PTIN before preparing returns. *See PTIN Requirements for Tax Return Preparers*, Internal Revenue Service,

for tax years 2023 and 2024 in connection with this scheme. At least 58 of those returns were identified as fraudulent and prepared for taxpayers who reside in or near St. Louis, MO. The returns claimed an aggregate of $1,868,149 in refunds, and the IRS paid $208,283 in connection with the fraudulent returns. as identified through IP addresses, Preparer Tax Identification Number (PTIN), and/or other identifying characteristics. Tabron were prepared and filed the returns under Where it Counts Tax Preparation, TABRON's business, as identified through common IP addresses, PTINs (Preparer Tax Identification Number), and/or other identifying characteristics Tax returns were prepared and filed by TABRON through Where it Counts Tax Preparation. The refunds were paid by the IRS into a bank account at GreenDot Bank held by Speedy Refunds LLC, another business TABRON is associated with. TABRON used this GreenDot Bank account to issue refunds to the taxpayers. However, TABRON kept a portion of the taxpayers' fraudulent refunds and split the proceeds with his recruiters. He issued payments either through the GreenDot Bank account or through his personal bank account held at JPMorgan Chase.

**I. Proof of ownership, TABRON, GATLIN, and YOUNG iCloud Accounts**

11. On 03/26/2025, SA Labitska served a Grand Jury subpoena to Apple, Inc. to determine ownership of an account associated with Anthony TABRON. On 04/01/2025, Apple, Inc. responded with information confirming ownership of an account including the email anthony.tabron@hotmail.com. Apple also provided information indicating TABRON backs-up his

---

https://www.irs.gov/tax-professionals/ptin-requirements-for-tax-return-preparers.

messages/messaging app, bookmarks, calendars, iCloud photos, contacts, find my friends, iCloud Drive, notes, and sign in with Apple to iCloud.

12. On 04/07/2025, SA Labitska served a Grand Jury subpoena to Apple, Inc. determine ownership of iCloud accounts for Jerelle GATLIN and Dominique YOUNG. Apple, Inc. responded with information confirming ownership. Emails associated with those accounts are buck2nasty@icloud.com for GATLIN and dombrady102305@gmail.com for YOUNG.[3] Apple also provided information indicating GATLIN and YOUNG back up their messages/messaging app, bookmarks, calendars, iCloud photos, contacts, find my friends, iCloud Drive, notes, and sign in with Apple to their respective iCloud accounts.

**II. Proffer with Leset Moore, co-conspirator of TABRON and GATLIN**

13. On March 11, 2025, IRS-CI special agents, with the Assistant United States Attorney present, interviewed Leset Moore under a proffer agreement. Leset Moore provided details about a scheme orchestrated by Anthony TABRON to prepare false income tax returns solely for the purpose of generating high dollar-amount refunds. She also outlined Jerelle GATLINS's and Dominique YOUNG's involvement in the scheme.

14. Jerelle GATLIN (known to Moore as "Buck") facilitated a meeting between Anthony TABRON and Leset Moore via a phone call. Anthony TABRON stated Moore could make a lot of money referring clients to TABRON for the preparation of their income tax returns. TABRON would prepare income tax returns based off information Moore provided, then

---

[3] As described below in paragraph 36–38, IRS-CI associated dombrady102305@gmail.com with Young through review of text messages between members of the scheme obtained in connection with a proffer session, public records, and tax return information.

TABRON would mail refund checks to Moore for her to distribute to the client. Moore would get a portion of the refund.

15. Information TABRON requested Moore to obtain from clients included: ID (pictures of front and back of driver's license), Forms W-2 (if available), Social Security Number, first and last name, and address. However, the taxpayer's bank account information was not needed because TABRON would route the refunds to a bank account that he controlled and write/print checks from GreenDot.

16. Moore advised that TABRON maintained an office inside his house. Sometimes Moore Facetimed TABRON to provide him information and converse. She watched him prepare income tax returns sometimes and was able to see his home office setup over Facetime. Moore also knew of a possible physical storefront/office TABRON operated in Georgia.

17. Moore advised that, to avoid getting in trouble for the fraudulent tax returns, TABRON hired tax preparers with PTINS and used their PTINs to prepare income tax returns. MOORE did not know if TABRON used the PTINs when preparing income tax returns or edited the returns after the tax preparers already entered their information.

18. However, Moore believed that TABRON himself worked on most of the income tax returns. She stated he would "play with the numbers" to get large refunds for clients. After the income tax return was completed, Moore received the return via text message. She then texted the client a link to access their tax return.

19. Moore was unsure if TABRON used any tax credits on the returns to inflate refunds but advised that TABRON purchased a copy of a Schedule C (profit or loss from a business/sole proprietorship) and Forms 1099 to copy the numbers used to obtain a large refund. To Moore's

knowledge, TABRON added fake Forms 1099 to income tax returns she personally dealt with. Moore would guarantee a refund no less than $40,000.

20. Moore also described an attempt by TABRON to obtain the "sauce." Moore explained the "sauce" was information people sold describing how to fraudulently generate a higher tax refund. For example, in March of 2024, a St. Louis local named Aaliya (spelling unknown) was advertising "sauce" for sale. Moore reached out to Aaliya on her Instagram page via direct message to acquire the "sauce." Moore and TABRON paid $500 each via CashApp to Aaliya. The "sauce" they purchased was a Schedule C with a fake business, an EIN, and numbers typed into certain expense categories. In Moore's CashApp account, the note for the purchase could be "for business". Moore and TABRON did not purchase "sauce" from anyone else. TABRON did not mention if he purchased "sauce" from anyone else. Aaliya reached back out to Moore to say her "sauce" was not working as intended. Moore referred Aaliya to TABRON for assistance.

21. Most of the income tax returns TABRON prepared from information Moore provided did not receive a refund from the IRS to Moore's knowledge. Moore was compensated for returns that did generate a refund via CashApp, wire transfer, or in person. At one point, she traveled to Atlanta and was paid $7,000 in cash from TABRON.

**III. Interview with taxpayer Nijah Boykin regarding false tax return**

22. On March 07, 2025, IRS – Criminal Investigation special agents interviewed Nijah Boykin (Boykin), a taxpayer whose tax return was linked to TABRON, at her residence. During the interview, Boykin stated Leset Moore was advertising tax preparation activities on Facebook. Boykin contacted Moore via Facebook Messenger and requested Moore prepare her 2023 federal income tax return. Moore instructed Boykin to send her personal identifying information and that

of her child, and Forms W-2, to Moore, and Boykin sent that information to Moore via text message. (Boykin no longer has the phone that was used to send the messages to Moore.) Boykin sent no other information about income, credits, deductions, or other substantive tax information to Moore or anyone else for purposes of having her 2023 federal income tax return prepared.

23. Moore informed Boykin that "her stuff was put through" and that she would be receiving a refund of $22,000, of which Moore would receive a $6,000 fee. Moore told Boykin the refund would come via check. Boykin said she believed the expected refund amount was high, and she confronted Moore about it. Boykin told Moore she did not want "trouble", and that Moore needed to "fix that." Moore assured Boykin she would "fix" the return to reflect a refund more in the amount Boykin expected in the $7,000 to $8,000 range.

24. However, Boykin never received any refund proceeds for her 2023 federal income tax return. Moore advised Boykin to check the status of the refund online and to look for various mailings from the IRS that would allow Boykin to verify various information. Boykin asked her grandmother to check for mailings at the 868 Wall Street address to see if she received her refund. Boykin eventually was able to see online that her refund was issued by the IRS on April 27, 2024. Boykin asked Moore about the status and location of her refund money, but Moore claimed she did not know what happened to the funds. However, as described in detail below, TABRON and Moore kept the refund paid out for Boykin's 2023 tax return. TABRON and Moore split the refund between themselves, and Boykin did not receive any amount of the refund.

25. On one of the instances in which Boykin asked Moore about the refund, Moore mentioned someone named "Anthony" who may be able to help. Boykin asked, "Who the hell is Anthony?" Moore responded that Anthony is a "boy I am working with." Moore got Anthony on a phone call with Boykin on one occasion to inquire about the refund, but Anthony did not know

anything about the status of the refund. Boykin said she was under the impression that Moore had prepared her return, but she never met Anthony in person. She did not know where Anthony lived. Moore gave Boykin Anthony's telephone number, and she talked to him on the phone on one other occasion about the status of the refund. Boykin recalled Anthony told her he did not know what happened to her refund and referred to Moore possibly receiving the funds.

26. IRS-CI agents presented Boykin a copy of 2023 Form 1040 U.S. Individual Income Tax Return (DLN 80221468239744) filed with the IRS in her name and reviewed the information in the return with her. Boykin confirmed the identifying information on the return (name, address, social security number) to be correct. Boykin confirmed the information on the Forms W-2 from CDE Health Care Services, Inc. and Provision Living Assistance, LLC to be correct. Boykin believed she had another Form W-2 from Love's Travel Center for the 2023 tax year but was not able to send it to Moore in time to have it included on her tax return. However, Boykin said the dividend income of $187,635 and associated federal tax withholding of $41,279 from PennyMac Mortgage Investment Trust were not correct, she did not provide this information to Moore or anyone else, and Moore did not ask or tell her about this reported information.

27. Boykin also said the information reported on the return's Form 5695, "Residential Energy Credits," was not correct. Boykin said she did not have any major home improvements or additions in 2022 or 2023, much less the $23,951 claimed in the Form 5695 submitted with her 2023 return, and in fact did not even own her own home in those years. Boykin said she did not provide the figures on the Form 5695 to Moore and Moore did not ask her any questions about the residential energy credit. Boykin agreed she was not eligible for the credit.

28. IRS records indicate a refund of $41,537 was paid by the IRS on 04/24/2024 where it was deposited into a bank account controlled by TABRON (Speedy Refunds). Boykin confirmed

that she did not receive any of the refund claimed on her 2023 Form 1040 and paid by the IRS.

29. Following the deposit of Boykin's refund on 04/24/2024, four checks (check #92245354, #92245355, #92245356, and #92245357) were drawn on the Green Dot Bank account totaling $41,537, the amount of the refund payment. The checks were made payable to Boykin but were endorsed over to Speedy Refunds LLC.

30. IRS-CI presented Boykin copies of the checks drawn on the Green Dot Bank account described above. Boykin confirmed she never received, saw, or signed over the checks, and the handwriting on the back of the checks is not her own. Boykin also advised that she has never heard of a company called Speedy Refunds.

**IV. Wire Transfers to Leset Moore from Anthony TABRON**

31. IRS-CI reviewed bank accounts held by Anthony TABRON and Leset MOORE and identified at least $37,000 in transfers between between Anthony TABRON and Leset Moore that appear to have been made in furtherance of TABRON's scheme to fraudulently obtain large refunds from income tax returns described in Moore's proffer session. Specifically, on 04/04/2024, TABRON wired $20,000 from his JPMorgan Chase account to MOORE's Regions bank account, and on 04/26/2024, TABRON wired $17,000 to Moore's Regions Bank account.

**V. Text Messages - Leset Moore and Anthony TABRON**

32. Text messages were extracted from Leset Moore's iPhone that further corroborated the information provided in Moore's proffer session. Specifically, from January 31, 2024, until August 27, 2024, 1,434 messages were sent between Moore and TABRON, many of which discussed the filing of tax returns amongst other topics. For example, the following text string shows TABRON informing Moore his ownership of Where it Counts Tax Preparations and his

involvement with Speedy Refunds. Both names are seen in wire transfers to co-conspirators (part III and V of Statement of Probable Cause).

| Participant | Date | Text |
|---|---|---|
| Moore | 08/22/24 | What's the name of the tax company again |
| Tabron | 08/22/24 | Where it Counts Tax Preparations<br>The major company I'm under is Speedy Refunds |
| Moore | 08/22/24 | Got it |

33. Similarly, the following text string shows a discussion between Moore and TABRON about a "client," the preparation of their income tax return, and the fee Moore requested for the facilitation of their information to TABRON[4]:

| Participant | Date | Text |
|---|---|---|
| Moore | 04/16/24 | ***personal identifying information referenced in the footnote*** |
| Moore | 04/16/24 | Did we forget her |
| Tabron | 04/16/24 | Think so I'll do that tonight |
| Moore | 04/16/24 | Can u send her copy she just txt |
| Tabron | 04/16/24 | The one you just sent? |
| Moore | 04/16/24 | Yea |
| Tabron | 04/16/24 | 18k on hers how much your fee |
| Moore | 04/16/24 | 7k |
| Moore | 04/16/24 | Send copy |

## VI. Text Messages and Identification of Dominique Young

34. IRS-CI also extracted a text string from Leset Moore's iPhone in which Leset Moore, Anthony TABRON, and three other parties discussed, between January 29, 2024, and extends to January 31, 2024, the filing of tax returns, and the division of the refund proceeds generated by those tax returns. One of the participants is listed in the text string under the email

[4] The first message is heavily redacted to protect the taxpayer's personal identifying information. The information provided included the taxpayer's name, phone number, birthday, social security number, home address, driver's license number, driver's license issued date, and the expiration date.

address dombrady102305@gmail.com. This participant ("DomBrady"), later identified as Dominique YOUNG as described below in in paragraph 36, named the text conversation string "TaxTime".

35. From training and experience, and from the context of facts already uncovered in this investigation, your affiant believes the individuals in this text string discussed a scheme to knowingly and willfully file false tax returns with the IRS. Your affiant believes the texts, as shown below, discussed: (1) information that was needed from individuals in order to file tax returns and verify information if contacted by the IRS; (2) how to split the refund proceeds among themselves and their "clients"; and (3) current and past methods of fraudulently obtaining tax refund proceeds, including current false claims for the Residential Clean Energy Credit and past false claims for the Employee Retention Credit and related COVID-era tax credits.

| Participant | Date | Text |
|---|---|---|
| DomBrady | 1/29/2024 | We got some shit going on its finna be up |
| DomBrady | 1/29/2024 | Appreciate y'all fasho |
| Moore | 1/29/2024 | Say no more jus let us know what all we need to ask |
| DomBrady | 1/29/2024 | This my bro I'm running it with y'all |
| Nisha | 1/29/2024 | Okay what abt id me |
| Moore | 1/29/2024 | Do they need id or pins? |
| DomBrady | 1/29/2024 | Ppl who have W2s we will need those W2s, SSN, pic of ID and mailing address |
| DomBrady | 1/29/2024 | As since y'all taking some off the top always leave a window open for y'all to get y'all parts of the bread |
| Tabron | 1/29/2024 | Did they do id me last year and we don't put ip pins on people unless the irs say |
| Moore | 1/29/2024 | What about the people w no W2s no kids jus self employment what they need |
| DomBrady | 1/29/2024 | So if ppl ask how much say shit like 10-13k returns that way when we get them 12/13 y'all take y'all parts and send them 10 |
| Tabron | 1/29/2024 | Jus ID SSN |
| Moore | 1/29/2024 | I'll ask but most ppl didn't |

| | | |
|---|---|---|
| DomBrady | 1/29/2024 | And mailing address, DOB of dependents and SSN of dependents |
| Tabron | 1/29/2024 | If they have |
| DomBrady | 1/29/2024 | Text y'all names so my boy can save y'all contacts as well |
| Nisha | 1/29/2024 | Nisha |
| Moore | 1/29/2024 | I'm Tosh 440# |
| Tabron | 1/29/2024 | I'm Ant I got y'all locked in |
| Moore | 1/29/2024 | Bet |
| Tabron | 1/30/2024 | Which credits was y'all using last year? |
| Tabron | 1/30/2024 | Was it Sch H? |
| Moore | 1/30/2024 | Covid |
| Tabron | 1/30/2024 | 7202? |
| Tabron | 1/30/2024 | or ERC? |
| Moore | 1/30/2024 | 7202 |
| Tabron | 1/30/2024 | Yea we ate off that |
| Moore | 1/30/2024 | Most definitely did but hopefully we can all eat with each other off this shit too |
| Moore | 1/30/2024 | My cousin doing taxes she said any suggestions on credits to add to boost her clients returns |
| Tabron | 1/30/2024 | She using the 5695? |
| Tabron | 1/30/2024 | For w2 people |
| Moore | 1/30/2024 | Not sure |
| Moore | 1/30/2024 | I'm finna ask |
| Moore | 1/30/2024 | Which form is that |
| Moore | 1/30/2024 | Like the name |
| Tabron | 1/30/2024 | Residential Clean Energy Credit |
| Tabron | 1/30/2024 | What software is she using? |
| Moore | 1/30/2024 | Crosslink |
| Tabron | 1/30/2024 | So the form only works for people who have paid a lot in the federal taxes on W-2s and it doesn't work for self-employment, when she adds the form, something should populate in box 14, and that's the number that she can use in box 12 to claim that credit |
| Moore | 1/30/2024 | Hey good afternoon |
| Moore | 1/30/2024 | What's the turn around on ppl knowing their amounts? Not rushing but yall knw some ppl thirsty to knw they amount especially ones w dependents |
| Tabron | 1/31/2024 | Trying to work those tonight for y'all and send in the am |
| Moore | 1/31/2024 | Ok thank you |

36. Records received in response to a grand jury subpoena to Apple revealed an iCloud account, person ID number 20891009580, linked to the email address dombrady102305@gmail.com, which was obtained from the text string above. The Apple records show this iCloud account is also linked to the telephone number (314) 688-0497 and addresses 3644 Kosciuko St., St. Louis, Missouri 63118, and 1453 Willow Lake Dr., Atlanta, Georgia 30329, and that the name associated with this iCloud account is "Dom Brady." Various data aggregator databases linked the telephone number (314) 688-0497 to an individual named Dominique Young at address 1453 Willow Lake Dr. in Atlanta, Georgia.

37. IRS-CI reviewed tax returns filed by Dominique Young, 1453 Willow Lake Dr., Apt. C, Atlanta, Georgia 30329, for tax years 2023 and 2024. The listed preparer for Dominique YOUNG's tax return for the 2023 tax year is Crystal Wright, the same preparer in Atlanta, Georgia whose name appeared on several of the tax returns that Anthony TABRON is known to have prepared for individuals referred by Moore. YOUNG's 2023 federal income tax return shows many of the same characteristics as the other tax returns in this scheme, including other income of $160,902 and federal tax withholding of $35,398, figures unsubstantiated by information returns on file with IRS, and a claim for the Residential Energy Credit of $28,691, and a claimed refund of $35,397.

38. Based on these similarities identified in YOUNG's 2023 tax return, her participation in the TaxTime text string described above, and from the context of facts already established in this investigation, your affiant believes that Dominique YOUNG was involved in recruiting individuals in the St. Louis, Missouri area to file tax returns through Anthony TABRON in a manner similar to how Moore recruited individuals and sent their personal identifying information to TABRON.

## VII. Financial Transactions Between Dominique Young and Tabron

39. Based on a review of bank records, IRS-CI has also determined that YOUNG also received substantial payments from TABRON's personal bank in a manner similar to how TABRON sent funds to Moore. For example, in April 2024, four tax refund checks from Green Dot Bank, payable to a taxpayer with the initials K.R. of St. Louis, Missouri, were deposited into a bank account (Wells Fargo account ending 4217) for a business called Speedy Refunds, LLC in Sandy Springs, Georgia. Three checks were in the amount of $10,000 each, and one check was in the amount of $8,204.05, for a total of $38,204.05 in checks. The backs of the checks contain the following endorsement: "K.R. pay to the order of Speedy Refunds, LLC." One day after the deposit of these checks into the Speedy Refunds, LLC account, a wire of $45,849 was sent to TABRON's personal bank account (ending 6175) at Chase Bank. The following debits then occurred out of TABRON's Chase Bank account.

- 4/11/2024: $9,000 wire transfer to The Bancorp Bank account of K.R.
- 4/11/2024: $3,000 Cash App payment to Dominique Young
- 4/12/2024: $9,000 wire transfer to Millennium Corporation account of K.R.
- 4/12/2024: $3,000 Cash App payment to Dominique Young
- 4/15/2024: $3,000 Cash App payment to Dominique Young

40. A review of K.R.'s federal income tax return for tax year 2023 showed suspected fraudulent information consistent with the other false tax returns involved in this investigation. The return reported $187,543 in gambling income and $45,010 in federal income tax withholding from Horseshoe Casino, as well as a claim for a $35,962 Residential Energy Credit, but thee gambling income and tax withholding are unsubstantiated by information returns on file with the

IRS. The information on K.R.'s 2023 return resulted in a refund of $44,874.95 issued by the IRS. Based on the financial transactions described, your affiant believes TABRON kept the $6,670.90 difference between the refund paid by the IRS for K.R. ($44,874.95) and the aggregate check deposit in the Speedy Refunds bank account ($38,204.05), YOUNG received $9,000 from the amount remaining $38,204.05, and K.R. received $18,000.

41. In addition to the CashApp transfers described above in relation to K.R., IRS-CI also identified numerous other transactions between YOUNG and TABRON. For example, below is a list of bank wires to Dominique YOUNG's account at Chase Bank (account ending 7148) from Anthony TABRON's personal account at Chase Bank (account ending 6175):

- 5/3/2024: $12,500
- 5/23/2024: $8,750
- 5/30/2024: $12,200
- 6/6/2024: $12,200
- 6/14/2024: $6,500

Similarly, below is a list of additional Cash App transfers from TABRON to YOUNG:

- 3/4/2024: $1,500
- 3/8/2024: $2,500
- 3/18/2024: $2,500
- 4/22/2024: $1,100
- 4/22/2024: $3,000
- 4/22/2024: $3,500
- 4/22/2024: $2,000
- 8/13/2024: $1,300

42. Like with the financial transactions between MOORE and TABRON, many of these wire transfers and Cash App transfers from TABRON to YOUNG followed wire transfers from Speedy Refunds, LLC to TABRON. Those wires from Speedy Refunds, LLC to TABRON were preceded by deposits of refund checks, payable to individuals with St. Louis, Missouri addresses but endorsed over to Speedy Refunds, to the Speedy Refunds, LLC account at Wells Fargo.

**VIII. Jerelle GATLIN**

43. As described above, GATLIN facilitated the introductory meeting between MOORE and TABRON where TABRON described the scheme to MOORE and how she could make a lot of money participating in it. As mentioned in the proffer, Moore did not know GALTIN by name but knew his moniker "Buck". Using the phone number under the "Buck" contact Moore had saved in her phone, IRS-CI issued a subpoena to Apple, Inc. for records related to the "Buck" phone number, and Apple identified the iCloud account buck2nasty@icloud.com associated with this phone number. Account information for this iCloud account provided the owner as Jerelle GALTIN.

**TRAINING AND EXPERIENCE RELATED TO FALSE CLAIMS AND OTHER TAX RELATED CHARGES**

44. Based on my training, experience, and knowledge of this case, and discussion with other agents, I know that individuals who commit fraud and prepare false income tax returns will use social media, email addresses, and other applications through providers including Apple to

communicate in furtherance of their illegal schemes. To further their activities, fraudsters may use text message capabilities linked to the use of Apple products to communicate their plans.

45. Based on my training, experience, knowledge of case, and discussion with other agents, I also know individuals committing fraud related to income taxes will often communicate via email or text message with co-conspirators and "clients" to further the scheme. Communications with co-conspirators include, but are not limited to, information related to how to conduct the scheme, how and where to send payment, and the location of the conspirators. Communications with "clients" include, but are not limited to, requesting personal identifying information, sharing completed and false income tax returns, and requesting payment.

## BACKGROUND CONCERNING APPLE[5]

46. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

47. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

---

[5] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c. iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e. Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their

location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

48. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

49. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including

the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the SUBJECT ACCOUNTS were created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the SUBJECT ACCOUNTS is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the SUBJECT ACCOUNTS, and other log files that reflect usage of the SUBJECT ACCOUNTS.

50. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

51. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of

other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

52. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

53. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where,

and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

54. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

55. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

56. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

57. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

58. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

59. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the United States copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

60. Based on the forgoing, I request that the Court issue the proposed search warrant.

61. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile

the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

**REQUEST FOR SEALING**

62. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

I state under the penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Joseph Labitska
Joseph W. Labitska
Special Agent
IRS – Criminal Investigation

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41, on February 3d, 2026.

HONORABLE JOSEPH S. DUEKER
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**4:26 MJ 2011 JSD**

**Property to Be Searched**

This warrant applies to information associated with the Apple accounts identified as anthony.tabron@hotmail.com, buck2nasty@icloud.com , and dombrady102305@gmail.com (SUBJECT ACCOUNTS) that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

## ATTACHMENT B

## 4:26 MJ 2011 JSD

### Particular Things to be Seized

**I. Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b. All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber

Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c. The contents of all emails associated with the account **January 01, 2024 to present** including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d. The contents of all instant messages associated with the account **January 01, 2024 to present**, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f. All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and capability query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My and AirTag logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g. All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with AirTags, Location Services, Find My, and Apple Maps;

h. All records pertaining to the types of service used;

i. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

**The Provider is hereby ordered to disclose the above information to the government within 14 days of the date of this warrant.**

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 286, 287, and 371 in addition to 26 U.S.C. § 7206(2), those violations involving Anthony TABRON, Jerelle GATLIN, Dominique YOUNG, and others and occurring after January 01, 2024, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a. Evidence indicating the preparation or facilitation of the preparation of false income tax returns for the purpose of obtaining large tax refunds, including but not limited to:

i. the recruitment of taxpayer clients;

ii. the personally identifiable information necessary to prepare tax returns;

iii. the process of preparing false income tax returns;

iv. methods to inflate tax refunds, including credit and withholding information;

v. the payment of tax refunds; and/or

vi. the distribution of fraudulent proceeds;

b. Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

c. Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

d. The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

e. Messages from the account holders describing the facilitation and perpetration of the scheme to create false income tax returns for obtaining large refunds.

f. Messages identifying additional coconspirators and identifying which income tax returns prepared are fraudulent.